UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RONALD SINGER,                                        :
                                                      :
                Plaintiff,        :        **Civil Action. No. 20-4019**
                                                      :
        v.                                    :        **COMPLAINT**
                                                      :
VILLAGE OF MONTICELLO, NEW YORK,                      :
  and GARY LASHER                                    :        **JURY TRIAL DEMAND**
                                                      :
                                                      :
                Defendants.       :
                                                      :
-------------------------------------------------------------X

## **NATURE OF THE ACTION**

This is an action against defendant to recover damages for discrimination on the basis of religion and retaliation for opposing the unlawful discrimination, in violation of Title VII of the Civil Rights Act of 1964. Plaintiff Ronald Singer alleges that as a building inspector employed by defendant municipality, defendants Monticello and denied his requests for reasonable accommodation of his duties so that he could practice his Jewish Orthodox observance. They then retaliated against him for making the repeated requests and complaining about unequal treatment of Orthodox Jewish residents and homeowners in Monticello. Plaintiff also alleges a hostile environment on the basis of religion and subject to a hostile environment and ultimately, a discriminatory and retaliatory termination of his employment. Plaintiff also requests that the Court take supplemental jurisdiction over his similar claims against the Village and individual defendant Gary Lasher under the New York Executive Law Section §296.

1

## JURY DEMAND

1. Plaintiff Ronald Singer demands a trial by jury of all issues in this action.

## PARTIES

2. At the time of the acts complained herein, plaintiff Ronald Singer was and is a resident of South Fallsburg, New York, County of Sullivan, in the State of New York.

3. Plaintiff Ronald Singer ("Singer") in early 2017 began his employment as the Code Enforcement Officer in charge of building inspection in the Village.

4. Defendant Village of Monticello, New York is a municipal government operating for the area of Monticello and providing public services and education for the locality of Monticello, including inspection and certification of new and modified buildings and land use.

5. Defendant Gary Lasher ("Lasher") is the Treasurer and then also Village Manager for the Village of Monticello, and he has his official place of business in Monticello, in Sullivan County.  He actively participated in and engaged in the discriminatory and retaliatory acts alleged below, and is named as an individual pursuant to the Human Rights Law.

## JURISDICTION, PARTIES AND VENUE

6. Jurisdiction of this matter in federal court arises because this court has subject matter jurisdiction in this action brought under a federal law, the Civil Rights Act ("the CRA") of 1964, as amended (1990), 42 U.S.C. Section 2000e, *et. seq*, that confers jurisdiction on a federal court.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as this case arises under the laws of the United States, the CRA, 42 U.S.C. §2000e.

8. Venue is appropriate here, because the events about which plaintiff complains substantially occurred in Monticello, Sullivan County, New York, which is an appropriate

location for those actions brought in this federal court.  This court is the appropriate venue for actions arising in that county.  Upon information and belief, plaintiff's employment records are located in Monticello.

9. All administrative prerequisites have been met as plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Notice of Right to Sue from the Commission.  Plaintiff brings this action in a timely manner, as the Notice of Right to Sue from the U.S. Department of Justice was received less than 90 days ago.

10. Plaintiff filed a Notice of Claim with the Village of Monticello regarding his claims under the New York State Human Rights Law and Title VII of the Civil Rights Act of 1964 (amended 1990) before filing this Complaint.  Plaintiff requests that this Court grant supplemental jurisdiction of his claims under the New York State Human Right Law, §296, against both defendants Village of Monticello and Gary Lasher.  The claims under the Human Rights Law originate from the same operative facts regarding the failure to accommodate religious practice, discriminatory treatment and retaliation as posed under the federal law.

## FACTS

11. Singer began employment as the Code Enforcement Officer for the Village of Monticello, New York on April 24, 2017, after Monticello's Village Manager David Sager ("Sager") hired Singer for that position.  Singer's duties as the Code Officer consisted of inspecting commercial properties and homes to assure their compliance with the Village building and safety codes.

12. As part of his duties, Singer was typically available if there were any building emergencies, such as a fire or building collapses.  Singer made himself available at all hours, and often worked evenings on inspections and emergencies.

13. As part of his religious practice, Singer finished his work early on Friday afternoon and did not work on Saturdays, but did work on Sundays. When doing so, most all employees did not work on Saturdays and Sundays, so Singer more than made up his lost Friday work time by working on Sundays (in addition to his weekday evening work).

14. From the start of Singer's employment, Sager had permitted those accommodations to permit Singer's practice of his sincerely held religious beliefs. Sager permitted such accommodations until he left his Village Manager position in the summer of 2017.

15. At the time of hire, Village Manager David Sager had knowledge that Singer was a practicing Orthodox Jew, and accommodated Singer's religious practice regarding scheduling of work on the Jewish Sabbath. In fact, Singer initially suggested that one of the four inspectors from the neighboring town of Thompsonville could cover any occasional emergency that occurred on Friday night or Saturday. Sager himself preferred to cover any few emergencies (such as a fire, heating failure or flooding emergencies). He did cover several inspections or visits to properties when necessary on a Friday night or Saturday in the first months of Singer's employment.

16. Not only did Sager make these accommodations from the very start of Singer's employment, but he agreed to those accommodations before hiring Singer for the Code Officer position.

17. As part of Singer's duties as the Code Officer, Singer often inspected buildings owned by Jews, Muslims, and individuals of all nationalities. In performing his job conscientiously, Singer never made his recommendations about a building's compliance based on religion or a building owner's religious practice.

18. After Sager left in the summer of 2017, the Village replaced him with the Village Treasurer, Gary Lasher, who began working as both the Treasurer and the Village Manager in approximately the fall of 2017.

19. Soon after Lasher began in the Village Manager position, Singer spoke with him about Singer's responsibilities inspecting locations for Code, and the scheduling of that work given his observance of the Sabbath each week for religious observance.

20. At first, Lasher agreed to the scheduling accommodation about Friday and Saturday work. However, Village Manager and Treasurer Gary Lasher became very angry when Singer could not cover 911 calls and other emergency calls on Friday evenings and Saturdays. At that time, in the fall of 2018, Singer verbally repeated several requests to Lasher and Mayor Gary Sommers ("Sommers") for the reasonable accommodation requests regarding the scheduling of his job duties so that he could practice his sincerely held religious belief about observing the Sabbath on Friday late afternoon and Saturday. In fact, when Sommers had first become Mayor, Singer and the Mayor had discussed the Sabbath work issue. The Mayor had said that he would contact the Town of Thompson for a mutual arrangement, regarding Sabbath coverage of emergencies, but he never did.

21. Because Singer could not appear at inspections on late Friday afternoons and Saturdays given his religious practice on those days, he had attempted to arrange with the Building Inspectors of one of two small nearby towns, including Thompson, for it to cover any emergencies in Monticello during the periods when he was not available during the religious observance on Friday afternoons till Saturday's sunset. In exchange, Singer had of course offered to be available to assist the other Building Inspectors in those neighboring towns when they were unavailable, such as on others' religious holidays.

22. In fact, the other town inspectors told Singer that this would not be hardship for the other nearby towns, as these immediate inspection needs were rare. They also told Singer that they could cover and respond for him for any required visit to Monticello in the case of any emergency need.

23. Even after Singer reported the other inspectors' availability for emergencies to Lasher, Lasher informed him that such an accommodation unacceptable. Lasher participated directly in refusing to grant this religious accommodation.

24. Soon after, Mayor Sommers told Singer, in denying the accommodation, that Sommers' idea of what constituted an emergency was not the same as "his idea" of an emergency. Presumably, Sommers undertook to define the circumstances of an "emergency" as a more frequent event than had been previously understood, and then to imply that the arrangement with the other neighboring inspectors posed a burden to the Village.

25. Lasker and Sommers required Singer to be available at all times -- including during Singer's religious practice of rest on the Sabbath --regardless of the other town inspectors' availability. Both Lasher and Sommers informed Singer they could not grant the accommodation, and that they expected him to handle emergencies and 911 calls as part of the performance of his job duties.

26. Singer then simply repeated his need for the accommodation as part of his religious practice, and reiterated that there was no real burden to the other towns, but to no avail.

27. Following Singer's repeated accommodation requests in the fall of 2018, Singer experienced retaliation for his complaints on several occasions.

28. On or about December 26, 2018, Lasher became angry when questioning Singer about granting a building permit to the pump station for the new county jail, and demanded to

know the reasons why Singer had not granted a permit.  Lasher shouted at Singer, putting his face close to Singer's, and Singer explained that he was attempting to resolve the contractor's refusal to properly repave the newly paved Village road which had been excavated.  This was part of Singer's job before granting building permits on a justifiable basis.

29. The contractor at issue was not Jewish.

30. Lasher became angrier still, accused Singer of refusing his instructions, backed Singer up physically between his chair and desk, and then banged a 15-lb. rolled set of building plans onto Singer's hand.  Because Singer was then taking blood thinners, this broke blood vessels in his hand and caused abrasions.  Lasher only repeated that he was the boss, and did not apologize for striking Singer.

31. Singer soon filed a complaint with the police and Sheriff because of Lasher's physical assault and injuring his hand.   After Singer gave a formal statement, Singer learned that the Chief of Police had spoken with the District Attorney and he informed Singer that the D.A. would not prosecute Lasher.  In fact, Singer later learned that in investigating a complaint that Lasher had made against Singer, the Building Clerk Sandi Burke, who was present, lied to the District Attorney and charged that Singer punched Lasher in the stomach.

32. At a meeting on January 4, 2019 with the Chief of Police, the Mayor, and the Village Attorney, Singer again brought up the well-known fact of his Sabbath observance and the need for an alternate solution for 911 emergency calls during Jewish holidays and Sabbaths.  Singer also told them that the prior Village Manager Sager who had hired Singer had never informed him of any obligation to be available 24/7 and had permitted Singer not to attend any emergencies on the Sabbath.

33. Sommers stated that Singer was responsible for solving the issue.  Singer replied how he had taken responsibility:  Singer reminded them that he had spoken with a Town of Thompson inspector who said it had been done in the past, as long as it was arranged inter-governmentally.

34. Sager never having required emergency work at all times and days certainly related to the *de minimis* nature of the accommodation and Singer's initial acceptance of the position.  Singer never would have accepted the job nor given up his previous inspector job in New York City if he had known about such a requirement or inability to accommodate the Sabbath on the occurrence of an emergency.  His observance of his religion does not permit him to fulfill such a Sabbath work requirement.

35. At that same January 4, 2019 meeting, Singer spoke with Mayor Sommers and Police Chief Rob Mir about his assault complaint against Lasher.  Sommers warned Singer that he if he didn't like it when Lasher got angry and "went off" on him, it would be far worse with Sommers if Singer wasn't following directions.  Sommers warned Singer that if he didn't like it, he could "hand in" his keys and cease employment.

36. The concerted threats and delivery of violence contemporaneous with Singer's repeated requests for accommodation demonstrated an animus against Singer based on his religion and to deter and punish him for his repeated accommodation requests.

37. Not long after that meeting and also in January, Singer wrote a brief note to Lasher complaining that the Village was discriminating against him on the basis of his religion in refusing Singer's earlier request for accommodation, and had acted in a hostile manner towards him.  He described the hostility in his complaint that the attack and later follow-up was discriminatory on the basis of his Jewish religion.

38. Singer also believed that Lasher and Sommers were harassing him unfairly about not being available during religious practice, and blaming him for not having approved

8

certificates for buildings in a much quicker manner.  By constantly hounding Singer for building approvals and preventing Singer from completing his work, Lasher and Sommers now created a retaliatory environment for Singer's complaints of discrimination and requesting a workplace accommodation.

39. In February 2019, Lasher refused to allow Singer to apply paid holiday leave time for early departure of approximately 30 minutes on Friday for Sabbath observance, erroneously stating that Singer had not earned sufficient hours to take time off.  Singer stated that he would continue to take the time off for observance, and he did so, allowing Lasher to figure out the pay issue.

**Hostile Environment for Jews and Additional Retaliation**

40. On or about January 16, 2019, Sommers and Lasher accused Singer of having favored a Jewish homeowner who operated a synagogue at 50 Nelshore Dr and having unjustifiably granted them a permit.  Singer informed them that the permit stayed open, and there was a ready remedy of placing a bed or sofa in one room.  The non-Jewish Village Engineer, Glen Smith, who had also participated in the inspection, concurred.

41. Singer experienced other differential scrutiny of Jewish residents regarding the granting permits and Certificates of Occupancy.  Singer experienced anti-Semitic comments at work and other different treatment of Jews by the Building Clerk who reported to him and assisted with the certification paperwork.

42. During the summer of 2018, Building Clerk Sandi Burke was completing the paperwork for the certificate of occupancy on one Hasidic Jewish owned property, and then returned the papers to Singer instructing him to complete it for that property - the Waverly Gardens Development.

43. At another time, Burke then asked Singer whether he would require this Hasidic bungalow to tear down the structure they had built. Singer found this a strange requirement and told her that he would first provide the owners the opportunity to comply and restore the work as a covered patio with the permit, without tearing down the patio. Typically, all that need be done was to "restore premises to the prior legal condition" and close up the patio, with a small fine for having started work without a permit, without taking any dramatic action such as tearing it down.

44. Despite Singer's explanation to Burke about a fair process and warning, within a few days Burke on her own called and brought police to the property, who then vacated the synagogue during Saturday evening prayers. This departed from the correct process in several ways: it was beyond her authority to do as a Building Clerk, and in violation of Singer's explanation about even-handed fairness, not to mention his job authority. It was a harassing way to treat and interfere with the owners' religious practice while Singer had already informed Burke that compliance was under review.

45. Burke often made comments against Jewish residents, stating that they acted superior than others, didn't know how to maintain their properties and drove autos wildly. She also disparaged their shopping habits and use of entitlement benefits. These were negative stereotypes demonstrating animus against Jewish, and particularly Orthodox Jewish, citizens. Further, after Singer informed the Village's Director of Fire Safety that he is a Sabbath observant Jew, the Director's treatment of Singer became less respectful.

46. On another occasion, Lasher became angry with Singer after he denied a rental permit to a Muslim owner of a building. After the denial, the owner accused Singer of being racist, informing Singer that he would tell the Mayor that he was being racist (against Muslims)

in refusing to issue a rental permit for his building – despite the serious safety violations and problems.

47.     This accusation of racism (as Jew against a Muslim) by a member of the public was seemingly accepted and even endorsed by Lasher's – and the Mayor's – willful blindness to the safety issued posed by the roach infestation.

48.     Lasher demanded that that Singer issue the rental permit to the building, even though it had a roach infestation.  Singer informed Lasher that it simply was not legal to grant that rental permit because of the insect infestation in the building.  Similarly, Sommers also demanded that the owner be issued the permit, even after Singer showed him that the Code specified infestation as a safety violation precluding the issuance of a rental permit.

49.     At the end of December 2019, Lasher complained that the Jewish owned Waverly Gardens should not have received a Certificate of Occupancy because of a tax deficiency.  Singer told Lasher and the Village's counsel that Burke had already started the process of completing the Certificate of Occupancy, so he had understood that she had followed the protocol of first checking for any tax deficiency before starting a Certificate of Occupancy process.  Upon learning of the outstanding tax deficiency of over $50,000, Singer telephoned the owner who made the payment within a few days.

50.     Lasher hated that Singer was professionally friendly with many of the Hasidic Jews who live in Monticello, and instructed him to be more disapproving with them and less friendly and professional.  Lasher implied that Singer was treating Jewish owners in a preferential way because of their religion.  Such was contrary to Singer's every effort to apply the rules fairly to all.

51.     Indeed, one Department head of the Village, one of the Village Trustees, Carmen Rue, told Singer that outside sources had warned her sometime after Christmas 2018 that Sommers and Lasher badly wanted to get rid of him.

52.     Singer had also observed the denial of a variance for renovation of a home "shul" or synagogue for Jews at 50 Nelshore Dr., because it had a lack of parking.  In contrast, there were Christian churches on Broadway, at Holmes St., at Prince St., and at the mosque on Cottage St - all without parking areas.

53.     A Jewish property owner, Jack Ehrenhaus, spoke to Singer inside the Village hall on February 2, 2019 and Mayor Sommers joined them as they were speaking.  Sommers informed Ehrenhaus that he had to go to the Planning Board for his proposed occupancy of a first-floor commercial area and two upper floors of residential occupancy at a building located at 430 Broadway.  Sommers informed Ehrenhaus, who was Jewish and wore a skullcap, that he was allegedly required to go to the Planning Board, even though the Village had approved the occupancy in 2017, before Singer had started his work as the Code Officer.

54.     This requirement contrasted with the Village's granting a permit to a non-Jewish Muslim owner next door to Ehrenhaus's property, who received his permit without even submitting any plans whatsoever -- at 428 Broadway, as discussed below.  This was important different treatment on the basis of religion.

55.     In fact, the preferential treatment for a non-Jewish owner could be dramatic – as with this Broadway property.  Without Singer's knowledge, Burke issued a permit on the very large building at the 428 Broadway space for the non-Jewish owner who had submitted no building plans whatsoever.  But the Village had required those plans for other much smaller jobs at Hasidic-owned projects.  (In fact, later defendant accused Singer of having issued the permit

improperly, when he had done nothing of the sort, infra at ¶¶61-63).  His assistant Burke had issued the permit four months earlier, in October 2018, without Singer having any knowledge, and Singer learned that another Thompsonville building inspector had assisted Burke in permitting the permit.

56. These were part of a pattern where Singer had complained about or observed of greater scrutiny of Jewish properties while applying more lax standards to non-Jewish owners.

57. One particular Jewish owned conversion project was denied because there was no accompanying certified engineer report (but with accompanying drawings), whereas another much larger Muslim renovation was approved with no engineering report submitted whatsoever.

58. Unsurprisingly, Sommers' and Lasher's hostility towards Jews was not limited to their expressions and actions toward Singer.  Some of the Jewish citizens in the business community who regularly interact with the Village administration, Sommers, and Lasher have routinely experienced discriminatory animus and been subjected to discriminatory comments.

59. Less than two months after accusing Singer in January of favoring the Jewish homeowner at 50 Nelshore Dr., Sommers and Lasher told Singer that they were terminating his employment.  They began formalized removal proceedings against Singer on March 4, 2019.  They accused Singer of favoring the Jewish owners and the removal proceedings culminated in the formalized termination of Singer's employment on or about July 3, 2019.

60. Defendants relied on pretextual rationale in order to mask their retaliatory acts against Singer after he repeatedly requested a religious accommodation and spoke out in support of fair treatment of Jewish property owners.  The cited reasons for discharging Singer masked their motivation in firing Singer because he is Jewish, for treating Jewish residents fairly and for speaking up for Jewish owners when such was warranted.  Singer did so even at the public

Planning and Zoning board meetings where there was typically animus expressed against Jewish projects.

61. The Village's reasons for the termination are clearly a pretextual for its discriminatory and retaliatory acts. At the civil service hearing resulting in Singer's termination being upheld in the July 23, 2019 verdict against Singer, the Village alleged that it terminated Singer's employment because he had approved a permit in October 2018 for the property at 428 Broadway. The Village and Lasher alleged that the building was completely out of compliance with the Code and the owners should never have received a permit from Singer nor allowed to start construction. This was patently untrue. Singer knew nothing about it, and at the appeal he submitted the signed permit with Burke's signature, and not his own.

62. Nor did they present any evidence that Singer in fact had approved the signature for the permit, neither at the hearing or as part of the appeal.

63. The Village and Lasher nevertheless persisted in this fabricated and pretextual rationale to justify Singer's discharge. Defendants thus based their termination of Singer's employment on a provable and thorough lie.

64. Defendants also ended Singer's employment in retaliation for Singer's having awarded certificates fairly - not for treating Jews to extra benefits - but simply for enforcing the code in a non-discriminatory way, whether the occupant was Jewish, Muslim, or Christian. Lasher and Sommers wanted Singer to treat Jewish owners in a harsher manner than non-Jews, and fired Singer when he refused to do so, as he repeatedly applied fairness and even-handedness in a non-discriminatory manner. Defendants sought the harsher treatment of Jewish citizens in their administration of the Village's functions, such as regulating building construction and

occupancy.  Here, defendants acted to punish Singer for his adherence to non-discriminatory and even-handed treatment of Jewish owners is his capacity as a building inspector.

65. Such retaliation against Singer based on his requests for accommodation, his complaints about discrimination and the animus against him for being Jewish, have substantially affected his livelihood.

66. Further, during the period after defendants suspended Singer with pay, Lasher also refused to pay Singer during the Passover holiday for which he had earned holiday leave.  This is a further example of discrimination against Singer based on his Jewish religion:  Lasher and the Village paid other non-Jewish individuals for their earned holiday leave, then refused to pay Singer as a Jew during his Passover holiday period.  This less favorable treatment of Jewish employees epitomized the discriminatory treatment and animus of Singer's Judaism and Jewish citizens and property owners.

## FIRST CAUSE OF ACTION

## Title VII against Monticello

67. Plaintiff repeats and realleges paragraphs 1 through 66 of this Complaint as if set forth herein.

68. Defendant Village of Monticello violated Title VII by subjecting Singer to unlawful harassment on the basis of his religion – including by permitting its Village Manager to strike Singer in the hand – as well as by unreasonably denying Singer's request for a reasonable accommodation of his sincere religious practices.  Further, after denying his request for accommodation, defendant Monticello created a hostile retaliatory environment for Singer, including after he explicitly complained of religious discrimination and the failure to accommodate.  Tellingly, defendant also discriminated on the basis of religion against both

Singer and its Jewish citizens relying upon the Village's services.  It did so by instructing Singer to treat Jewish property owners less favorably or manufacturing reasons to prevent the operation of Jewish businesses and synagogues, and then unfairly criticizing and disciplining Singer when he protested about applying harsher treatment to Jewish owners and was accordingly unwilling to give preferential treatment to non-Jewish businesses.  Defendant's discriminatory treatment of its Jewish members of the public – or its Jewish "customers" – discriminated against Singer on the basis of his religion because such created a hostile atmosphere for him and altered his working conditions while observing this pattern of differential treatment and hostility towards Jews.  In fact, all the while Singer protested against the differential treatment of citizens on the basis of their religion, and was further retaliated against for his decisionmaking and acts when he spoke out and strove to complete his duties in an even-handed manner.  Such application of discriminatory treatment, failure to accommodate, and the creation of a hostile environment resulted in the unlawfully discriminatory and retaliatory termination of Singer's employment.  The differential treatment and the hostile environment subjected him to a hostile environment based on his religion and substantially altered his working environment and conditions of employment.

69. As such, defendant Village of Monticello's actions harmed plaintiff, such that it is liable to him for backpay, lost benefits, attorneys' fees, compensatory damages for emotional harm and upset, punitive damages and other applicable costs and fees.

## SECOND CAUSE OF ACTION

## Human Rights Law Claims against Monticello and Lasher

70. Plaintiff repeats and realleges paragraphs 1 through 69 of this Complaint as if set forth herein.

71. Defendants Village of Monticello and Lasher violated the Human Rights Law by subjecting Singer to unlawful harassment on the basis of his religion – including by permitting its Village Manager or actively participating to strike Singer in the hand – as well as by unreasonably denying Singer's request for a reasonable accommodation of his sincere religious practices. Further, after denying his request for accommodation, both defendants created a hostile retaliatory environment for Singer, including after he explicitly complained of religious discrimination and the failure to accommodate. Tellingly, defendants also discriminated on the basis of religion against both Singer and its Jewish citizens relying upon the Village's services. They did so by instructing Singer to treat Jewish property owners less favorably or manufacturing reasons to prevent the operation of Jewish businesses and synagogues, and then unfairly criticizing and disciplining Singer when he protested about applying harsher treatment to Jewish owners and was accordingly unwilling to give preferential treatment to non-Jewish businesses. Defendants' discriminatory treatment of its Jewish members of the public – or its Jewish "customers" – discriminated against Singer on the basis of his religion because such created a hostile atmosphere for him and altered his working conditions while observing this pattern of differential treatment and hostility towards Jews. In fact, all the while Singer protested against the differential treatment of citizens on the basis of their religion, and was further retaliated against for his decisionmaking and acts when he spoke out and strove to complete his duties in an even-handed manner. Such application of discriminatory treatment, failure to accommodate, and the creation of a hostile environment resulted in the unlawfully discriminatory and retaliatory termination of Singer's employment. The differential treatment and the hostile environment subjected him to a hostile environment based on his religion and altered his working environment and conditions of employment.

72.     As detailed above, defendant Lasher actively participated in, insisted on and initiated the refusal to grant a reasonable accommodation, the creation of a hostile environment on the basis of religion, and the retaliatory harassment and ultimate discharge of plaintiff. Lasher actively participated and took the lead in retaliating against plaintiff and manufacturing pretextual reasons for terminating plaintiff's employment. Given his active role in initiating and participating in the acts of discrimination and harassment -- and engaging in harassment which included a physical attack -- and retaliating against Singer with manufactured reasons for Singer's discharge, Lasher is a proper individual defendant under the Human Rights Law.

73.     As such, defendant Village of Monticello's and Lasher's actions harmed plaintiff, such that they are liable to him for backpay, lost benefits, compensatory damages for emotional harm and upset, and other applicable costs and fees.

**WHEREFORE**, Singer demands judgment against Defendants as follows:

(a)     on the Title VII Cause of Action against defendant Monticello alleging discrimination, a lack of a reasonable accommodation, harassment and an atmosphere of retaliation and subsequent retaliatory discharge, an award of statutory damages, including back pay and fringe benefits, compensatory and punitive damages under the law, the exact amount to be proven at trial; including, but not limited to, injunctive relief such as reinstatement to the position, or front-pay, attorneys' fees, costs, and costs and disbursements incurred in connection with this action.

(b)     on the Human Rights Law Causes of Action against both defendants alleging discrimination, a lack of a reasonable accommodation, harassment and an atmosphere of retaliation and subsequent retaliatory discharge, an award of back pay and fringe benefits, and compensatory damages under the law, the exact amount to be proven at trial; including, but not limited to, injunctive relief such as reinstatement to the position, or front-pay, incurred in connection with this action.

Dated: Goshen, New York
      May 22, 2020

MICHAEL RANIS, Attorney at Law

By:   *s/Michael Ranis, Esq.*
Michael Ranis, Esq. (MBR #3757)
ATTORNEY FOR PLAINTIFF
Co-Lab Goshen
45 St. John Street
Goshen, NY  10924